IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 1, 2025

**SARAH CHAPMAN v. CHRIS WADE**

**Appeal from the Juvenile Court for Williamson County**
No. 39316     Sharon Guffee, Judge
_____

**No. M2025-00129-COA-R3-JV**
_____

The trial court entered a parenting plan setting parenting time and child support between Mother and Father.  Mother appealed.  Mother raises a due process challenge to the trial extending into the late evening of the last day.  She also challenges the trial court's analysis of the best interest factors, its allocation of parenting time, its designation of Father as the primary residential parent, its awarding to Father sole decision-making authority, and its denial of Mother's motion to alter or amend.  Father seeks attorney's fees on appeal.  We affirm the trial court's ruling and award attorney's fees.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

JEFFREY USMAN, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., C.J., and VALERIE L. SMITH, J., joined.

Marjorie A. Bristol, Goodlettsville, Tennessee, for the appellant, Sarah Chapman.

Kristen J. Johnson, Nashville, Tennessee, for the appellee, Chris Wade.

**OPINION**

I.

In issuing its ruling, the trial court observed that this case is "the most difficult case the Court has heard in twenty years."  Sarah Chapman (Mother) and Chris Wade (Father), who were not married and lived in different cities, conceived Preston, the child who is the subject of the custody dispute, in 2015.  Mother almost immediately determined that she wished to place the child for adoption with Kelly and Pamela H. (collectively, the

Guardians), but Father from the beginning expressed concern about giving up his child. He proposed having sole custody of the child, and he took all available steps to parent the child, including registering with the Ohio putative father registry, preparing a space in his home for the child, offering Mother financial support, and filing a petition to establish paternity. The Guardians were aware prior to Preston's birth that Father sought custody of the child and that he did not want his child to be adopted. They emailed Father prior to the birth, using a fictitious name, asking him to "reconsider" and to allow the adoption to proceed. After Preston's birth, Mother and the Guardians sought to terminate Father's parental rights in Ohio. Following an initial lower court decision unfavorable to Father, the litigation stretched over the course of two years, during which Father was not permitted contact with the child. The Ohio Supreme Court, however, ultimately ruled in Father's favor and denied termination.

Mother and the Guardians immediately shifted litigation to a new forum. Mother, who lived in Florida, and the Guardians, who lived in Tennessee with Preston, sought to terminate Father's parental rights in Florida only days after the Ohio courts determined that there was no basis to terminate Father's parental rights.

Meanwhile, Father was first permitted visitation with Preston in September 2018. However, prior to permitting visitation, Mother and the Guardians required Father to undergo extensive psychological testing at significant expense to him despite the lack of evidence of any psychological deficiency.

In 2019, when Preston was three years old, the Florida court denied termination, finding, among other things, that Mother and the Guardians had continuously frustrated Father's attempts to parent his child, while Father had "jumped over every hurdle put in front of him." The Florida court declined to credit Mother or the Guardians when they represented that they had wanted the birth father involved, noting that they "purposefully avoided" keeping Father involved. Additionally, the Florida trial court found that, after the Ohio decision, Mother "had no intention to negotiate a parenting plan" with Father and that she made no attempt to assume custody. The Florida trial court found that, during the pendency of the Florida proceedings, Mother and the Guardians had "thwarted [Father's] attempts to know his son and did not attempt to diminish any potential harm or trauma . . . by fostering a relationship" between Preston and Father. The court found Father "took every action within his control to assume a parental role and responsibilities for" Preston and that he "was prevented from enjoying more communication and visitation by the actions of the [Guardians] and [Mother]." Of Father, the Florida trial court noted that he had "expended considerable resources for the right to assume all parental duties." The Florida court concluded that "[t]his is a person who desperately wishes to parent his child." Alternatively, the Florida trial court concluded that Mother "has done everything in her power to ensure that did not happen because of her belief that [Preston] should be raised in her chosen two-parent household." Accordingly, the trial court appointed an expert to assist in Preston's reunification. The Florida appellate court affirmed the denial of

termination.

At this juncture, the Guardians represented to Father that they would no longer pursue adoption. Furthermore, Mother sought permission from the Florida court to relocate to Tennessee, falsely representing to the Florida court that the change in residency would "allow Mother to parent [Preston] in a more meaningful manner as [Preston] transitions into the primary care of Mother." Based on this misrepresentation, instead the Florida court granted Mother permission to move, and two weeks later, the Guardians filed a petition to terminate Father's parental rights in Tennessee, attaching Mother's written consent to the adoption.

For a brief period of time, the Florida court continued to exercise jurisdiction in an effort to transition Preston to the custody of his biological parents at the same time that the termination proceedings went forward in Tennessee. After assuming jurisdiction, the Tennessee trial court ultimately denied the petition to terminate, finding that Father had established that his failure to send child support for a period of time after the Florida court had ruled in his favor was not willful failure to support.

Father had been adjudicated as Preston's legal and biological father in Florida in July 2020. After the Williamson County Juvenile Court's ruling denying termination in 2022, Father immediately sought to establish parenting time. Mother and the Guardians sought to avoid granting Father parenting time by filing a motion to stay any ruling on Father's motions while they appealed the denial of termination.[1] The trial court denied the stay but permitted interlocutory appeal; however, this court denied permission to appeal under Tennessee Rule of Appellate Procedure 9. Father filed another motion to set parenting time in September 2022, and Mother and the Guardians filed a response asking the court to order only supervised parenting time because Father had called the child "son" and himself "daddy" during zoom calls. The trial court stated it would grant transitional parenting time and set a hearing in September 2022.

Mother and the Guardians then sought a different route to prevent Father from exercising parenting time by filing another petition for termination in chancery court, while the prior denial of termination was pending on appeal. On the day before the scheduled hearing on Father's transitional parenting time, Mother and the Guardians requested a stay based on this new termination petition, which alleged failure to support. The juvenile court concluded that Tennessee Code Annotated sections 36-1-113(d)(4) and 116(f)(2) required it to stay the custody proceedings while this second Tennessee termination proceeding was pending.

---

[1] In the motion for interlocutory appeal, Mother and the Guardians represented that the irrevocable injury required by Tennessee Rules of Appellate Procedure 9 was that Father would have contact with Preston: "If the stay is not granted pursuant to Tenn. Code Ann. § 3G-1-116(f)(2) and the Court begins to increase the visitation between the child and the father, further confusion will befall the child."

Meanwhile, the first Tennessee termination proceeded on appeal, and this court affirmed the denial of termination, concluding that Father's failure to support was not willful based on the jurisdictional complexity of the case, on the proceedings to transition custody of the child to Mother and Father that were contemporaneously taking place in Florida, on the differences between Tennessee and Florida law, on the misrepresentations made by Mother and the Guardians regarding their intention to discontinue efforts at adoption, and on Father's expenditures on necessities in his preparation to receive the child into his custody. *In re Preston H.*, No. M2022-00786-COA-R3-PT, 2023 WL 6793215, at *13-16 (Tenn. Ct. App. Oct. 13, 2023). This court also identified potential due process concerns with any termination of Father's parental rights under the circumstances presented but concluded that it was unnecessary to reach the issue, having already found that the trial court had properly concluded that any failure to support had not been willful. *Id.* at *16.

When this court issued its decision affirming the denial of termination in October 2023, Preston was almost eight years old, and all parties recognized the difficulty inherent in effecting a change in custody under these circumstances. The Tennessee Supreme Court denied review in January 2024.

The Guardians voluntarily dismissed the second Tennessee termination petition after the Tennessee Supreme Court denied review of the first. An order of dismissal was entered as to the second Tennessee termination petition on August 12, 2024, in which the court noted that the petitioners had filed a notice of voluntary dismissal in July.

On August 12, 2024, the same day the second Tennessee termination was dismissed by the court, the Guardians filed a petition for dependency and neglect and for guardianship.[2] Father moved to dismiss and again requested guardianship, describing the Guardians' motion as abusive and attaching documentation tending to show that the Guardians in January 2024 had provided Preston's school with the overturned Ohio trial court order in an attempt to convince the school that Father's parental rights had been terminated. The petition for dependency and neglect was voluntarily dismissed at a hearing on September 4, 2024, with the court reserving ruling on the guardianship issue. The court reappointed the guardian ad litem (GAL) from the first termination proceeding.

On August 12, 2024, Father, joined by Preston's GAL, filed an Emergency Motion to Place Minor Child in Father's Custody. In this motion, they noted that the Guardians' attorney had withdrawn pursuant to Rule 3.3(f) of the Rules of Professional Conduct,[3] and

---

[2] This petition is not contained in the record on appeal.

[3] Rule 3.3(f) provides:

If a lawyer, after discussion with the client as required by paragraph (e), knows that the

they detailed the numerous motions the Guardians had filed seeking to disqualify the GAL.[4]

Father and the GAL attached a sworn declaration from Dr. Katie Spirko, the court-appointed psychologist, who opined that Preston "has consistently presented as a bright, cheerful, considerate, neurotypical child" when with Father outside the proximity of the Guardians and that he "presents in a regressed and emotionally distressed manner while in the care of" the Guardians. Dr. Spirko noted that the guardian Pamela H. "described the child as aggressive, out of control, and devoid of a conscience when having him evaluated for an autism spectrum diagnosis." Dr. Spirko, however, concluded that Preston was "neurodevelopmentally normal, if not intellectually advanced" and that the symptoms observed by the Guardians "appear to be a mix of misrepresentation by [the Guardians] for purposes of gaining a litigious advantage, and the child exhibiting situationally-dependent anxiety and stress responses to [the Guardians'] manipulative behavior towards this child in an effort to portray the child as traumatized by his interactions with [Father]." She further stated that she had observed the child in multiple settings on multiple occasions and that she only saw him exhibit distress with the Guardians, adding that she observed them contribute to his distress by interacting "in ways that have been in direct violation of the Court's orders." Dr. Spirko concluded that the child was "being significantly psychologically abused by [the Guardians]" and that their continued custody would cause him substantial harm. Father and the GAL attached an earlier declaration from Dr. Spirko noting that Preston had refused to participate in a video call with Father based on guardian Kelly H.'s statements to Preston that Father would take Preston away and Preston would never see his family again. Preston also reported to Dr. Spirko that the Guardians laid financial difficulties at Father's door due to litigation costs and hid Father's presents to Preston in the garage because Pamela H. felt they were "dirty."

Mother opposed the request for custody, instead proposing that she would arrive in Tennessee the next day and remove Preston to Florida. Mother also sought to transfer the case to Florida, which the trial court declined to do. The trial court entered an order preventing the Guardians from leaving the jurisdiction with Preston and scheduling a hearing. Mother and the Guardians sought and were denied appellate review under Rule 10, challenging the trial court's exercise of jurisdiction in the case and of an order regarding

---

client still intends to perpetrate the crime or fraud, or refuses or is unable to disclose or otherwise rectify the crime or fraud, the lawyer shall seek permission of the tribunal to withdraw from the representation of the client and shall inform the tribunal, without further disclosure of information protected by RPC 1.6, that the lawyer's request to withdraw is required by the Rules of Professional Conduct.

Tenn. R. Sup. Ct. Rule 8, RPC 3.3(f).

[4] Mother and Guardians sought to appeal the denial of the GAL's disqualification to this court pursuant to Rule 10, but the petition was denied.

virtual appearances.

On September 12, 2024, the trial court entered an order in which it determined that a transitional period would be necessary for the child, based on testimony from Father, the Guardians, the court-appointed psychologist Dr. Katie Spirko, and Dr. Jana Hunsley, a psychologist hired by the Guardians to treat Preston.

The trial court heard the case in December 2024. Father testified that, in the prior year and a half, he had been permitted to have more contact with Preston, including unsupervised overnight visits, and that he had been able to bond with Preston, forming a "really strong emotional connection." Preston had visited with Father overnight in Tennessee, had made two extended visits to Father's home in Michigan, had visited Louisiana to see Father's extended family, and had met Father's girlfriend and Father's girlfriend's daughter, who is close to Preston's age. Father introduced numerous photographs of Preston smiling and enjoying visitation while engaging in age-appropriate activities such as riding go-karts, catching frogs, building wooden machines, cooking, and doing chores. Preston wanted to wear matching shirts with Father and wanted to wear Father's necklace during visitation. Father participated in a fun run at Preston's school and met his teachers prior to taking Preston to Michigan for fall break. Father stated that there were no issues during the visits, other than a bed-wetting incident the third or fourth day of the visit with Father's family in Louisiana over Thanksgiving. This occurred after Preston, during a call with Mother, referred to Kelly H. as "Kelly" and Mother responded by asserting that Preston should refer to Kelly H. as his father. Father testified that he had not asked Preston to call him "Dad" but that Preston had begun to do so. Asked if he had ever sent Preston home with urine-soaked clothes in a bag, Father adamantly denied doing so.

Father testified that, for the past four years, he has had a room set up for Preston. Father owns his home and has lived there for five or six years. Father has family support in Michigan, including a nearby cousin who is married to a teacher and has three young children. Father's girlfriend of four years and her daughter, who is Preston's age, also have family nearby. Father had explored schools near his home, and he had identified a dentist and pediatrician for Preston. Father planned to have Preston attend counseling if he were awarded custody, and he stated he would follow professional recommendations. For the past three years, Father has been employed as a buyer of parts for an automobile company, and he is eligible to obtain health insurance for Preston. His salary was $113,000 plus a bonus in 2023 and $108,000 in 2022.[5] Father worked from home twice a week, and his work schedule would generally allow him to take Preston to and from school. Father

---

[5] Father's attorney sought to have Father identify the first page of his 2023 tax return, but the Guardians' attorney objected to its introduction under the doctrine of completeness. The court noted that it could simply rely on testimony of income, and Father then testified to his income without consulting the document. There was no objection to the court's stated intention to rely on the testimony.

indicated that he wished to have custody of Preston and to have Preston live with him most of the time. Father's parenting plan proposed minimal time with Mother, which Father testified was based on Mother's lack of willingness to be a parent.

Father testified that he was awarded weekly zoom calls with Preston but that the Guardians were interfering with those calls. He testified that they would, for instance, turn the screen so that Preston could not see him. Father also introduced an order from the chancery court from August 2024 that found the Guardians were impeding zoom visits and that ordered an expansion of Father's overnight visitation. Father testified that zoom calls were moved to Dr. Spirko's office for a few months, but the Guardians would occasionally not bring Preston on time. The Guardians proposed having more frequent and shorter calls from their home in September 2024, noting that the calls could happen organically as Preston did his normal activities, and Father agreed. However, Father testified that the Guardians failed to facilitate these calls during October.

According to Father, the Guardians also failed to follow the parameters set by Dr. Spirko for custody exchanges. For instance, Father was scheduled to have parenting time after attending Preston's school fun run, and the Guardians were instructed to drop Preston's belongings at the school office. However, Kelly H. did not drop off the belongings at the office; rather, he kept the belongings in his car, "lingered" around the office, wanted Father and Preston to retrieve the belongings from the car, and followed Father and Preston in the parking lot. Father also testified that when he attempted to contact Preston's school in September 2024, he was initially denied information because the school believed he was not Preston's parent.

Father stated that he facilitated three calls between Preston and the Guardians during the Thanksgiving visit and that he had "never denied a call or a FaceTime that [Preston was] willing to have." Father acknowledged that Preston had a close relationship with the Guardians, and he testified he would not purposely diminish that relationship. Father averred he would follow the recommendations of therapists, counselors, or experts regarding Preston's relationships, and he affirmed he would follow all court orders. Father acknowledged he had previously identified himself to Preston as Preston's father although the Florida-appointed transition specialist had at the time told him not to do so. Father acknowledged that he had not attempted to contact Preston's school prior to the fall, but he explained that he had asked for, and not been given, school information in the past. Father had not come to Preston's soccer games. He noted that in 2021, when the Florida transition expert had awarded him parenting time, he had arrived early for his parenting time and watched Preston at a golf camp from his car in the parking lot. Father's car was suddenly surrounded by the police, who had been called by Kelly H. Father feared this could happen again if he were to try to attend his son's extracurricular events. He had not attempted to contact Dr. Hunsley but had provided her with his contact information. He was in contact with Dr. Spirko, who communicated with Dr. Hunsley and informed Father of developments. Father testified that he had never declined visits offered by the Guardians.

The Guardians submitted two undated letters in which they essentially urged Father not to try to remove Preston from their care, offering in exchange to give him some sort of role in Preston's life. Father testified that any visitation offered in the letters was not with him in a parental role but with the Guardians supervising and gatekeeping interactions and for the purpose of facilitating the adoption.

He also testified that he believed Preston and Mother had a good relationship but that he did not believe Preston saw her as a parent. Preston never referred to Mother as "mom," and he did not speak about Mother to Father. Father nevertheless stated that he believed it was important for Preston to have a relationship with Mother. He averred he would keep Mother informed of Preston's activities, schooling, and health.

Father testified that two days prior to the first day of trial, he received a call from police in Louisiana indicating that Mother had made allegations that Preston was actually conceived as a result of sexual assault that allegedly occurred more than nine years earlier in Louisiana. In addition to Father speaking with law enforcement to address this matter, Dr. Spirko also communicated twice with law enforcement in Louisiana. She indicated that based upon those conversations she had no concerns about Father's character or ability to parent in relation to this matter. Dr. Spirko observed that parents will make allegations for strategic advantage in contentious litigation over custody. The trial court did not find credible Mother's assertion that these allegations were not made to influence the proceedings. The trial court concluded that Mother made the allegations in "an attempt to keep Father away from" Preston.

Regarding a birthday party for Preston that became a focus of concern for the Guardians, Father testified that Preston had asked him to host a birthday party and that Preston decided on the type of party and guest list. Invitations were sent out to a character-themed party held at a local venue during Father's parenting time. The Guardians and their biological child, Preston's little brother, were invited to the party. The Guardians ultimately stayed an hour after the party had concluded, after all other guests had left, and they lingered in the parking lot after leaving the event space. Father acknowledged he did not consult the Guardians prior to planning the party, noting that he had intended to discuss it during a call but that the Guardians had withheld zoom contact during the entire month of October prior to the party.

Father's mother testified as to the positive relationship between her son and Preston. She indicated that Preston seemed relaxed and affectionate around Father and that she observed no behavioral problems during the time she had spent with him.

The GAL presented the testimony of Stephanie Dunn, Preston's teacher, who testified that Preston was happy, engaged, and respectful, with no disciplinary problems and good grades. He worked well with other children and with adults. Preston had

educational accommodations such as promptings and reminders per a 504 plan, but his teacher had not had to use them. She had observed no difficulties at school. Preston had been dismissed early from school often, though, approximately fourteen times during the semester.

The assistant principal at Preston's school, Leslie Beasley, also testified that Preston was generally happy, smiling, and willing to have a conversation at school. He had no behavioral issues or problems interacting with peers. Ms. Beasley was made aware that birthday invitations for Preston's party had been brought to the school office, and she called Father to tell him the school policy that invitations delivered at school could go only to one of three groups: the whole class, all the boys, or all the girls. Ms. Beasley and Father consulted with Preston about the guest list, and Preston was given the invitations to take to the boys in his class. Ms. Beasley confirmed that Preston knew about the party and was very excited about his themed costume. Ms. Beasley identified school records reflecting that Preston had 24 early dismissals in second grade and 26 in first grade. She stated that the school typically asked parents to let it know about recurring appointments necessitating absences, but to her knowledge, that had not occurred with Preston. Ms. Beasley indicated that she had never had any interaction with Mother. Ms. Beasley was present during the above-discussed fall break fun run custody exchange. She testified that Kelly H. was supposed to bring the bag into the school but had not followed that procedure and had instead left it in the car, making it necessary for Preston and Father to walk out with Kelly H. She observed Preston looking confused and "a little lost" when he saw both Father and Kelly H. at pickup.

Dr. Spirko testified that she began working with Preston in early 2024. She had observed Father's parenting time with Preston and concluded Preston had fun, was affectionate, and was engaged. Preston showed no distress. Dr. Spirko observed that Father had more of a parent-child bond with Preston than Mother did.

According to Dr. Spirko, the Guardians failed to follow her instructions. At one point, during a time when visitation was regularly scheduled in Dr. Spirko's office, Mother and the Guardians requested to be allowed to coordinate calls from the Guardians' home, representing that the calls could be spontaneous and could include sharing Preston's activities. Dr. Spirko thought this would be beneficial. However, the Guardians subsequently refused to facilitate the calls; "there were no attempts at any point to make any calls to [Father] with Preston." Regarding the fun run exchange, Dr. Spirko also testified that she specifically instructed the Guardians to drop Preston's luggage in the office for the fall break exchange "to avoid the exact situation that occurred," i.e., Preston suffering confusion when he saw both Father and Kelly H. at pickup. She testified that the Guardians did not follow the instructions that they had been provided.

The Guardians also did not follow court orders. The chancery court had ordered

that the sessions with Dr. Spirko not be recorded.[6]  Nevertheless, at one session in Dr. Spirko's office, a recording device fell out of Preston's pants.  Dr. Spirko testified Preston had been told that the device was tracking his steps and that the information would be put onto his grandfather's computer.  Dr. Spirko concluded that this incident reflected on the Guardians' willingness and ability to abide by court orders.

Dr. Spirko observed that, when the Guardians were not present, Preston was a "developmentally typical, healthy, social, happy young child."  The Guardians enrolled Preston in neurofeedback sessions, which Dr. Spirko described as "where they hook people up to EEGs and then pretend that it has some interpretable basis."  Dr. Spirko deemed the treatments "trendy" and a "pseudoscience" which was not scientifically valid.  The sessions were meant to address bedwetting, but Dr. Spirko testified that the micturition inhibition center controlling urination was in the medial frontal lobe, out of reach of the devices used.  Dr. Spirko asked about the neurofeedback after Preston told her he had an appointment to get his brain checked and fixed, raising her concern that the therapy made Preston think that something was wrong with his brain.  Dr. Spirko testified that the Guardians had a history of doctor shopping.  For instance, Preston's medical history did not indicate autism, and both the school he attends and a separate, private school evaluated him and found he did not have autism.  The Guardians nevertheless obtained an autism diagnosis by taking him to third evaluator, to whom they did not provide the prior evaluations.  Dr. Spirko also observed that Preston was frequently dysregulated when seeing the Guardians' chosen therapist, Dr. Hunsley, and that Pamela H. frequently had to be involved in the sessions, which to her indicated that Preston's relationship with Dr. Hunsley was not a successful therapeutic dynamic.

Regarding the above-discussed birthday party, Dr. Spirko indicated that she had participated in deciding how to distribute invitations.  She testified that she was concerned from her observation of Mother and the Guardians that "the invitations would be sabotaged" and that Preston would suffer resulting stress.  She advised Father to mail her the invitations so that she could arrange to have them distributed at school.  Dr. Spirko testified that Father sent an invitation for Preston's little brother and the Guardians, which was meant to be brought home by Preston from school.  After the invitations were distributed, the Guardians contacted Dr. Spirko, asserting that Preston was distressed by the idea of having the party and worried the Guardians and his brother wouldn't be able to come, "as though this birthday party was being thrust upon [Preston] by [Father] in some manner that was causing him distress."  Mother emailed Dr. Spirko that a "strange man" had delivered invitations, and Dr. Spirko felt the email mischaracterized the invitations as a "mystery" and was manipulative.  Dr. Spirko attended the party and confirmed that the Guardians were "lurking" well after the party had ended.

_____

[6] The chancery court order entered August 1, 2024, stated, "All parties remain prohibited from recording the sessions, whether in Dr. Spirko's office or elsewhere."

Dr. Spirko testified that she had observed Kelly H., both on zoom and in person, and had seen him "get up and smack the computer and stomp off." Kelly H. was "cackling or laughing" when Father made statements that he was Preston's dad. She was concerned that Kelly H. was not behaving appropriately in front of Preston regarding Father, given that he was unable to control his behavior in a formal setting among adults.

Regarding Mother, Dr. Spirko received "a series of emails from [Mother] that concerned [Dr. Spirko] in terms of [Mother's] genuineness in the process." Dr. Spirko observed Preston after his visits with Father because Mother and the Guardians would report to her that Preston was dysregulated, stressed out, and wetting the bed. From observing Preston after his visits with Father, Dr. Spirko believed that Mother "was making up stories." Dr. Spirko testified that Mother and the Guardians were presenting a narrative that was contradicted by Dr. Spirko's observations of Preston at school and with Father. In particular, she observed that Mother and the Guardians attempted "to disrupt, dysregulate and terrorize Preston so that they can present a narrative that he is being upset by [Father]."

Preston had never mentioned Mother to Dr. Spirko. When Mother was brought up, Preston had no negative feelings; he liked Mother. However, Preston did not display any sort of parent-child bond with her. Dr. Spirko observed Preston and Mother at a horse ranch, and there was only minimal interaction between them. Preston told Dr. Spirko that he preferred to call the Guardians "Kelly and Pam" when he was with Father and "Mom and Dad" when he was with the Guardians. She testified that Preston specifically told her that he was not prompted to do so by Father and that her observations confirmed this. On the other hand, Dr. Spirko had overheard Preston refer to Father as both "Chris" and "Dad," but Preston denied calling him "Dad," which she interpreted as Preston exhibiting concern that he would get in trouble. She testified Preston was having to "code-switch" depending on his environment.

Dr. Spirko indicated that Mother had on multiple occasions conveyed a situation "as though Preston was traumatized by" Father. Dr. Spirko testified that Mother emailed her that Preston was distressed regarding the Thanksgiving call where Preston referred to Kelly H. as "Kelly." Mother told Dr. Spirko that Preston was being pressured to refer to his Guardians by their first names. Dr. Spirko spoke to Preston and concluded that "it was clear to me that [Mother] was not being accurate in her appraisal." Dr. Spirko opined that Mother was engaging in "blatant parental alienation."

Father, on the other hand, was in Dr. Spirko's opinion the best suited to provide primary care for Preston. She testified that Mother and the Guardians were "doing everything they can think of to interfere with Preston having a relationship with" Father as a result of "narcissistic and borderline personality traits," and that their actions were not in Preston's best interest. She believed Father would be able to provide Mother with

- 11 -

information about and access to the child. She recommended a transfer in custody at the semester break. She concluded, "Preston would be most well suited to spend his time like a normal little boy, playing sports and playing with his friends and going to school, and being shielded from adults who should be in therapy." Dr. Spirko stated that she could not clinically recommend that Preston have contact with Mother and the Guardians because "there is significant parental alienation behavior that has gone on and . . . intensifies when . . . they are unhappy" and that "it would be inappropriate for me to recommend anything other than contact be substantially limited." Dr. Spirko opined that, due to the extent of parental alienation in the case, her recommendation would be for Preston not to have contact with the Guardians for some time, according to the clinical consensus on the treatment of alienation.

Dr. Spirko acknowledged she spent more than 30 hours observing Father interact with Preston but only spent one hour observing Mother interact with Preston. She testified that she did not have to intervene or redirect Father during visitation and that she was "impressed" with him as a parent. She recalled meeting with Mother and acknowledged that Mother suggested that Mother, Father, and the Guardians should all spend time together as a group. Dr. Spirko thought this was a good suggestion. Mother suggested a joint birthday party. Dr. Spirko later facilitated the party without contacting Mother because she was concerned by that time that Mother would sabotage the party, as Mother continued to assert "that Preston is fearful and distressed by his interactions with [Father] when that's not consistent with how Preston . . . is acting or behaving." Dr. Spirko testified that Mother spent enough time with Preston "to create an impression that she wants to be his parent so that she can align with" the Guardians in seeking custody. She agreed that Mother emailed her about urine-soaked clothes in Preston's bag after a visit with Father. Mother facilitated one call with Father after her meeting with Dr. Spirko. Dr. Spirko acknowledged that, when first appointed, she told Preston no one wanted to take him from his family with the Guardians, although Father was in fact seeking custody. She explained that Father was not seeking to deny all contact, which was what Kelly H. had told Preston. She acknowledged that Preston had told her he did not want to be pulled from his family and live with Father, but she did not think Preston should "be tasked with" deciding what was in his best interest. She acknowledged that Preston exhibited distress before some zoom calls with Father at the Guardians' home; the calls were moved to her office with the same result. Dr. Spirko asked the Guardians stay outside the building and there was improvement.

Father called Mother as a witness. Mother has degrees in engineering and business. She testified that she moved to Tennessee in January 2021 purportedly to provide primary care for Preston. However, she never actually provided primary care, noting that she did not have a living situation that would have accommodated him at the time. Mother secured employment when she moved in 2021 but was terminated in the fall. She was at a new job for three or four months, then in early 2022, began a job with a company out of Florida. She worked partially remotely until she moved back to Florida in the summer of 2022.

Mother did not recall that the termination petition filed in September 2022 represented to the court that she resided in Tennessee but agreed that such an assertion would not be accurate. She agreed that she signed a lease in Florida about two months after the first attempted Tennessee termination was denied by the trial court. Mother testified that her move to Florida had "a negative impact" on Preston but acknowledged she had said at her deposition "he didn't seem to have any negative impact." She testified, "I think both statements are true." She agreed she did not have a parent-child relationship with him at the time she moved and agreed that she does not have one now. Mother's base salary is around $97,000 to $100,000, and she is eligible for a monthly bonus. Her income in 2023 was around $100,000. Mother also sometimes does house-sitting.

Mother lives with her sister in a three-bedroom home that her sister owns. She pays $500 per month in rent, although her lease reflects a rent of $1,200 per month. Mother's hours vary "somewhat wildly." However, she testified she would be available to care for Preston, as her schedule was also "somewhat flexible." Although she "fairly often" did site visits in her job supporting theme parks and these visits could be late at night or early in the morning, she had been granted an assistant and anticipated more flexibility. She has lived in three homes and had four jobs over the past five years.

Mother was trained in Trust-Based Relational Intervention, designed to help children "of adoption, trauma, and abuse cope and connect with their caregivers." She testified that her pregnancy was traumatic for her and "that definitely had an impact on him when he was in my womb. And then being placed with the [Guardians] and not having the security and stability of his home was pretty traumatic for him."

Mother testified that since moving to Florida, she has visited Preston 30-40 days per year. She stays with the Guardians on visits and takes Preston out for activities. Preston had never had an overnight visit with her without the Guardians present. She had not sought such visitation even after the dismissal of the most recent termination petition, explaining that she did not want to explain to Preston why she was making a significant change in their relationship. Mother testified she had taught Preston to rollerblade, play lacrosse, and ice skate during their outings. She testified she was involved with his activities, therapy, and school meetings and that, when she was in Tennessee, she would help with homework and evening routines such as dinner, baths, and bedtime. The Guardians were present most, but not all, of the time. The longest she had ever had one-on-one time with him was for a full day and evening. She explained that she and the Guardians "work as a team" and "are a family." Preston has visited Mother's family in Ohio about six times with the Guardians, and Mother has vacationed with Preston and the Guardians. Mother has a boyfriend she has been seeing since April 2024; Preston has met him twice. Mother stated that in the past few years, the longest she had gone without seeing Preston was "a couple months." Mother began paying child support in 2018 and had missed a few months of payment. She agreed that the Guardians had paid substantial amounts of attorney's fees for her.

- 13 -

Mother testified she was unaware that Preston had not had routine childhood vaccinations for the past several years but that she was aware he was not fully vaccinated; she had never attended a pediatrician's appointment. Mother had never spoken to the therapist who was seeing Preston prior to trial in the first failed attempt at termination in Tennessee and had never met his prior therapist. She agreed that she filed a motion in response to Father's motion for custody in which she proposed taking Preston to Florida, explaining that she thought it would be unsafe for Preston to go with Father, whom he did not know well, and that she did not want him "to potentially go into government custody with, like, a foster family situation." Mother denied that she intended to give her parenting time to the Guardians but stated she would give them open communication and access. Mother has a will which leaves her property to her sister, to her parents if her sister does not survive her, and to Preston if her sister and parents predecease her. Mother had not submitted a proposed parenting plan to the court as of the second day of trial.

The GAL introduced Mother's credit card statements, which tended to show, through restaurant and other purchases, that Mother was physically present in Tennessee for only a few days in February 2021, immediately prior to signing her consent to adoption, and that she was not physically present in March and present for only a few days in April, despite the representation in the petition that she resided in Tennessee. The transactions showed Mother had traveled significantly, including internationally; she generally did not take Preston on her trips. Mother spent much of November 2024, the month before the trial, in Africa. While she spent some time in Tennessee between February and December 2021, the charges tended to show that she was not spending more than half her time in the state, and the charges tended to show that she was not in-state in February or March 2022, although she had testified she did not move to Florida until summer. There were no charges in Tennessee for Mother in May, June, July, or August 2023.

Mother indicated that she had contacted Preston's school in the fall to determine what their policy would be "for communications when people call the school looking for information about a child." The school responded that it would only communicate with those who had parental rights or guardianship, and Mother responded on August 15, 2024, "Thank you! [Father] does not have parental rights to Preston at this time." Mother explained she did not want Father to be able to make decisions or pick up Preston, although the email itself only asked about the policy regarding communication. Mother, however, claimed her intention was not to deny Father contact with the school. Mother also indicated that she contacted the police in Louisiana accusing Father of sexually assaulting her at the time of Preston's conception and that this allegation may have been made only after the hearing granting Father visitation. Mother denied filing the report in an attempt to prevent Father from getting custody, stating, "I really thought that it wouldn't have anything to do with the custody proceedings." She testified she had not been believed and wanted to "finally" tell the truth but hoped Preston would never find out. She stated, "And I know that [Father] is capable of terrible things and I hope he never does anything like that to Preston."

- 14 -

Although Mother testified that she and the Guardians had offered Father opportunities to participate in Preston's life and he had declined, she agreed she never offered any visitation that was not supervised by the Guardians. According to Mother, when Father was psychologically evaluated during the Florida proceedings, the evaluator stated Father manipulated the test. Mother testified that when she moved to Tennessee, she sent Father updates about Preston's education and medical history, including Individualized Educational Plans, through a Google Drive, but she discontinued that because Father did not respond and was "threatening" her. She later clarified that the "threat" was Father's "[b]asically" "saying he's only willing to work with me if I answer all these questions and I align with what he says." After reviewing an email, she agreed that Preston was not vaccinated for COVID but that she had required Father to show COVID vaccination before allowing visitation with Preston.

On the second day of trial, the parties discussed the timing of proof. The trial court stated that the trial could go a little late on the second day and that on the third day "we're going to go until we finish. So get your babysitters in line." Father's proof had included the testimony of Father, Dr. Spirko, Father's mother, and also of Mother. Mother was called to testify on the second day by Father's counsel, and her testimony continued well into the third day, with Mother testifying that she had the desire and ability to take custody of Preston, as detailed above.

At around 4:00 p.m. on the third day, Mother's counsel began her proof by calling Pamela H. Pamela H. testified that the Guardians had gotten to know Mother well during the pregnancy and that Pamela H. held Preston immediately after birth. The Guardians remained in contact with Mother and her family. Mother visited Preston at the Guardians' home when he was four months old and had been in regular contact since. Pamela H. testified that the Guardians had a power of attorney and had consulted with Mother regarding medical and other decisions. Mother was "an extension of our family" and Preston enjoyed spending time with her. She taught him to ride horses, play lacrosse, and ice skate. Mother took him on roller coasters at Disney World when she worked there, gave him a subscription to kits for building projects, and she was present when he learned to ride a bike. Preston asked about her when she was not there, and they had regular telephone contact.

Pamela H. testified that the Guardians reached out to Father before Preston was born. While they did not give him contact information, she believed he could have obtained it. According to Pamela H., Preston became aggressive and dysregulated in July 2019, around the time visitation began with Father. For instance, Preston began throwing rocks at Pamela H., cars, and his baby brother when asked to buckle up after a nature hike. As a three- and four-year old, he acted jealous of his baby brother; at one point he "caused [his brother] to break his arm in two places" shortly after a visit with Father. They obtained therapy and an Individualized Educational Program (IEP) for him at the time. Pamela H.

- 15 -

felt that Dr. Spirko's opinion was "one-sided" and blamed the Guardians. She testified that Preston would become dysregulated by visits with Father. She denied that the Guardians intentionally spoke negatively about Father. She indicated that there was confusion about the custody exchanges and that Preston was not given adequate notice about his schedule. She testified that Father did not facilitate contact between the Guardians and Preston when Preston visited Father in Michigan, but she acknowledged she did not request a call. She testified that Father did not have a car seat in his car when he picked Preston up for a visit, even though she believed he was required to have one.

Pamela H. identified numerous photographs of Preston and Mother enjoying age-appropriate activities together, including riding horses, visiting Disney World, and building with toys. There were also photographs spanning years of Mother and Preston, including Mother assisting with bathtime and Mother waiting with Preston for the school bus. Mother was present for the first day of first grade in 2022. Pamela H. testified Mother participated in developing an IEP for Preston. Mother read to Preston and mailed him educational materials. Mother had always been a part of Preston's life, but the Guardians were the ones who cared for him on a day-to-day basis. Preston's little brother, the Guardians' biological child, had a liver transplant, and during that time, Mother and Mother's sister and parents assisted with Preston's care. Pamela H. testified, "It's a full-time job for both Kelly and I to help to manage his emotions and regulate," and she stated Mother had assisted with helping Preston calm down. Pamela H. was willing to support Mother if she received primary custody, and the family would visit him in Florida. Pamela H. insisted that Mother's interest in parenting was not manufactured for the purposes of court hearings, and Mother had always been "affectionate, warm, loving." The Guardians had not refunded Mother her child support payments. Mother visited approximately five times per year for three to ten days.

Pamela H. indicated that she had learned of neurofeedback from her adoption community, where some parents had experienced success with it. She indicated that Dr. Hunsley had approved of the idea. Pamela H. believed Preston had trauma from a stressful pregnancy and "the time in the womb" and also "relational trauma that started when visitation occurred with [Father] and . . . the demanding nature of his initial relationship with Preston has contributed a lot to Preston's fears and trauma." She acknowledged that Father first met Preston right before the birth of Preston's little brother, who had a congenital medical issue, and that he began visiting regularly about a year later, several months after the transplant. She denied that any behavioral issues were tied to having a seriously ill younger sibling. Preston saw Dr. Hunsley weekly and had weekly occupational therapy and participated in neurofeedback. Preston had an IEP, but it was removed in 2023, against Pamela H.'s wishes. Pamela H. obtained an assessment which diagnosed Preston with autism, but she did not share the diagnosis with his school, which had done its own testing finding that Preston is not autistic, which was consistent with the determinations of other evaluators.

Pamela H. testified that she signed a religious exemption from vaccinations in September 2021. In November 2023, Preston's pediatrician had discussed CDC-recommended vaccinations with Pamela H., and she had declined vaccines. Preston last received a vaccine in May 2019, when he was three years old. She testified that she and the pediatrician were "on the same page." Preston had been prescribed medication for ADHD earlier in the year, but Pamela H. had not yet given him the medication because she was worried about side effects and was endeavoring to do things in "the safest, natural way possible." She indicated that the prescribing doctor described the medication as optional. She testified that Preston would pick up on people's emotions, but she acknowledged she had told a medical provider that he "lacked empathy." She invoked her Fifth Amendment rights when asked if she had placed a recording device in Preston's pocket prior to a session with Dr. Spirko, but she acknowledged that the court had prohibited her from recording Preston's sessions with Dr. Spirko.

Regarding the above-discussed birthday party, Pamela H. stated that Preston had asked the Guardians to plan a birthday party and that she had a list of kids to invite and she was planning to finalize the party the day he brought home Father's "invitation that was left over from giving to his classmates." She acknowledged that although she was planning to have a birthday party for Preston, she did not share those plans with Father. According to Pamela H., Preston came home from school "confused" and pulled out an invitation to the birthday party, then became "distraught" and was "crying hysterically." A recording of Preston and the Guardians interacting regarding the invitations was introduced. In the recording, Pamela H. tells Preston that the Guardians had no idea about Father's party, that the Guardians had wanted to host a birthday party at the skating rink and to invite Father, and that they had it all ready to set up when they found out about Father's party, which had been booked "behind [their] backs." Upon discovering that only the boys were invited, the Guardians commented that they had been planning to invite the whole class to the skating party. Unsurprisingly, the eight-year-old child, upon being told that a skating party had been in the works but was no longer planned, began to cry. Preston's little brother then came up with the solution: a suggestion that Preston could have multiple birthday celebrations. Pamela H. agreed that Father had not been invited to a prior birthday party and had not been informed about the IEP meetings.

Pamela H.'s testimony concluded around 7:00 p.m., and Mother's counsel was asked if she needed a break, but she indicated she was "ready to go[—]I will push through, whatever you need." At one point during the examination of the next witness, Dr. Hunsley, Mother's counsel paused before a question and then explained, "I'm sorry, Your Honor. I'm just so tired. I'm forgetting my train of thought." She later stated, "I wish I was more awake."

Dr. Hunsley testified as an expert in child psychology that she had been Preston's therapist since September 2023. The Guardians and their children had attended a camp designed by Dr. Hunsley that focused on Trust-Based Relational Intervention, and she had

no concerns about how the Guardians interacted with Preston.  She testified that Preston was distressed at the idea that he would live with Father beginning in December.  Dr. Hunsley and Dr. Spirko agreed that it was best to tell Preston that the decision would be made by the judge and that the adults in his life were advocating for what they thought was best for him.  Preston had mentioned Mother to Dr. Hunsley and shared when he had calls or visits with her.  Dr. Hunsley had observed Mother and Preston, and Preston was comfortable with Mother and displayed natural affection.  Dr. Hunsley and Dr. Spirko spoke on the phone weekly.  Dr. Hunsley agreed that Preston sometimes did not want to attend the therapy, but she explained that part of her role was to encourage Preston to process and face the upcoming change in his life and that these hard conversations caused dysregulation.  Dr. Hunsley testified that Preston was aggressive and angry and wanted "to destroy everything in [her] office" when she saw him the Monday after he passed out birthday party invitations on Friday.  Dr. Hunsley testified that Preston was in denial regarding the changes in custody, and she believed the transition should not happen until after the school year.  Preston did not want to leave his family, and the change would be traumatic for him.  However, she agreed that it would be traumatic for him "regardless of what happens."

Dr. Hunsley declined to make a custody recommendation but believed it was "most important" for him to maintain contact with the Guardians and believed the best way to maintain that was for him to be with Mother, due to Mother's relationship with the Guardians.  She opined that Mother and the Guardians had also been in denial regarding any custody change.  Dr. Hunsley had not seen anything to indicate there was deliberate alienation happening; she felt all the adults were under great stress and were not being "their best selves" in the matter.  She did not believe Pamela H. exhibited any personality disorder.  Dr. Hunsley stated she frequently saw children who functioned well at school but had behavioral dysregulation at home.  She did not believe the Guardians were intentionally dysregulating Preston but felt they had high levels of anxiety and that Preston would react to that.  Dr. Hunsley had given Father her contact information in September, but he had never reached out.  Dr. Hunsley felt that it would be best for the parenting plan to be determined and then for Preston to have some amount of time to transition into the parenting plan.

Mother was recalled as a witness.  She introduced a proposed parenting plan in which Father would get 84 days per year.  In her plan, a substantial number of these days were from Father having every other weekend as parenting time, even though he lived in Michigan, the place of exchange was in Florida, and the plan specified the child could not fly unaccompanied.  Her proposed plan gave Father two two-week periods in the summer as well as various holidays.

During Mother's testimony, the court noted there was no income information on the proposed plan.  Mother's counsel stated, "I have [Father]'s income and I have her income, but not knowing what the Court was going to — how this was going to transition. . . ."  The

court attempted to clarify whether income was to be based on the testimony, and Mother's counsel noted that part of Father's tax return had been "presented." The court observed that it did not have tax returns, at which point Mother's counsel stated she could "enter it together." She then elicited testimony from Mother that her gross income for 2023 was $87,350[7] and that she had received a raise of 2.5-3% in 2024. Mother agreed that a few days prior to her current testimony, she had testified that her salary was higher.[8] Mother testified she received additional, performance-based compensation of approximately $1,500 per month.

Mother asserted that she could support a positive narrative about Father in communicating with Preston, and she would obtain a "dumb" phone for him to allow him to contact Father or the Guardians. She had a room for Preston and had identified a school, pediatrician, and therapist's office. She wanted to get a home with a yard. She testified that she never anticipated Preston having to transition away from the Guardians after nine years in their care, although she acknowledged that a transition specialist had been appointed in the Florida court as early as 2019. She testified that she completed numerous consents to adoption because she felt it was in Preston's best interest and not because she did not want to parent. Mother agreed she had previously seen her role as nonparental. However, she testified she would act as Preston's primary caregiver and had no intention of abdicating that role. Mother denied that she corrected Preston when Preston called Kelly H. "Kelly" instead of "Dad" on the phone; she stated she was clarifying because she "genuinely didn't know who he was talking about."

At the end of proof, around 9:15 p.m., Mother's counsel requested to be allowed to argue by zoom or in writing due to the late hour. The court initially agreed. It then took a brief recess for the parties to discuss the schedule. When court resumed, the GAL stated that she and Father's attorney preferred to argue that night, while Mother's attorney did not. Mother's attorney did not, however, move for a continuance at this time or otherwise object, and argument proceeded. Mother's counsel argued that Mother was the best option to ease the transition for Preston, and she indicated that $100,000 was a reasonable amount for Mother's income, given Mother's testimony.

In its December 30, 2024 order, the trial court found that Father should be the primary residential parent, and it awarded Father 347 days of parenting time and awarded Mother 18 days of parenting time. The court designated Father as the primary residential parent and gave him sole decision-making for major decisions. The court found that the Guardians were no longer parties but shared a significant bond with the child. The court ordered Father to allow and assist the child to have calls with the Guardians anytime the

---

[7] Mother initially testified her income was $85,000 but returned after a break to state that the tax return showed $87,350.

[8] Mother had testified during a prior day of trial that her income was around $100,000 plus bonuses.

child wished to contact them. Broadly, the trial court's determination was based on factual findings that Mother had never sought any parental role in Preston's life, not even when changes in custody appeared imminent under court orders, whereas Father had taken every opportunity to seek custody of Preston and had on numerous occasions made ample preparations to receive the child into his home. The court dismissed the guardianship action.

In its custody order, the trial court found that Mother did not reveal the birth to Father and entered into an adoption agreement with Kelly and Pamela H. three days after the birth. All parties to the adoption agreement knew at the time they entered it that Father did not consent to the adoption. The court found that Father had continually defended his parental rights since he learned of Preston's birth. Mother and the Guardians, on the other hand, had filed four successive and unsuccessful petitions to terminate Father's parental rights. The court found that neither Father nor Mother had parented the child on a day-to-day basis but that Father had engaged in the most extended visitation in 2024, with Mother never having had overnight visitation with Preston. The court found that Mother had "solely aligned" with Kelly and Pamela H. and that the three "have made numerous efforts to impede Father's visits and contact with the child over the last nine years." The court found that the obstruction to visitation with Father "has caused and continues to cause the child to suffer substantial emotional harm." The trial court concluded that Mother had joined Kelly and Pamela H. in "a barrage of litigation and interference" that posed a danger to the child's psychological development. The court found that long-distance travel would disrupt the child's new schedule. Dr. Spirko had recommended immediate removal, and the court determined that it would follow her recommendation.

The court examined the best interest factors enumerated in Tennessee Code Annotated section 36-6-106(a)(1)-(15), and it found the bulk of them to weigh in Father's favor. Generally, the court found that Mother had made "no attempt . . . to move into the role of a parent," either in the past or even when faced with the prospect of having custody returned to her, while Father had taken on a parental role. The court also found Mother had interfered with Father's contact with the child and had been dishonest, while Father had demonstrated he could follow court orders and make the child a priority. The court found that while neither parent had been the primary caregiver, Father had taken greater parental responsibilities and had "done everything in his power" to have a relationship with the child, while Mother did not attempt to increase parenting time or have an overnight visit even after it became clear that custody must revert to the biological parents. The court also found that Father was better suited to meet the child's emotional and developmental needs, whereas Mother had aligned herself with therapies which Dr. Spirko persuaded the court were not beneficial. The court in general found Mother not to be credible. The court concluded that she had engaged in obstruction and parental alienation, and that her living environment was less stable than Father's. The court found that, no matter the custody determination, the child would have difficulty leaving the Guardians. While there had been no physical abuse, the trial court concluded that Preston was experiencing emotional abuse

due to the stress of the case and due to parental alienation perpetuated by the Guardians and Mother.

The trial court also found that Father's income was $113,000, based on his testimony. It found that Mother's income was $115,000, based on her testimony that her base income was $100,000, that she anticipated a 2-3% raise, and that she received approximately $1,000 per month as a bonus.

Mother filed a motion to alter or amend, seeking an adjustment in child support by including the actual travel costs she would incur in visiting Preston and asserting that the parties' tax returns showed that Father had a higher, and Mother a lower, income than the figures in the trial court's order.

The trial court denied the motion to alter or amend. The court noted that the parties had resolved any discovery disputes by agreed order in late November, and that the trial spanned three days and encompassed 35 exhibits. While the parents submitted sworn testimony regarding income, no tax documents were filed. The court found that no new facts or evidence had been discovered and that it had already allowed a deviation for Mother's travel expenses. Finding that Mother was attempting to merely relitigate previously adjudicated issues, the trial court denied the motion.

Mother timely appealed. On appeal, she raises the following issues, as renumbered:

1. Whether the trial court's insistence on concluding the hearing late into the evening on December 16, 2024—after affording Father nearly three full days to present his proof and requiring Mother to begin her case at nearly 4:00 p.m. and continue late into the night—denied Mother a meaningful opportunity to be heard in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, section 8 of the Tennessee Constitution.

2. Whether the trial court abused its discretion by limiting Mother's parenting time to only eighteen (18) overnight days per year and failing to maximize her parenting time as required by Tennessee Code Annotated section 36-6-106(a).

3. Whether the trial court erred in naming Father as primary residential parent and awarding him sole decision-making authority despite Mother's longstanding and consistent involvement in the child's life, and in the absence of any findings under Tennessee Code Annotated section 36-6-407(c) to support sole decision-making.

4. Whether the trial court erred in its best interest analysis by disregarding material evidence, failing to make a proper comparative assessment of the parents, and failing to follow controlling case law interpreting Tennessee Code Annotated section 36-6-106(a).

5. Whether the trial court abused its discretion in denying Appellant's motion to alter or amend under Rule 59.04, where justice required consideration of evidence excluded to accurately calculate child support.

Father defends the trial court's ruling and seeks attorney's fees on appeal.

## II.

Tennessee appellate courts review a "trial court's findings of fact following a bench trial de novo upon the record with a presumption of correctness, 'unless the preponderance of the evidence is otherwise.'" *Regions Bank v. Thomas*, 532 S.W.3d 330, 336 (Tenn. 2017) (quoting Tenn. R. App. P. 13(d)). As stated by the Tennessee Supreme Court, "[w]hen it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are 'uniquely positioned to observe the demeanor and conduct of witnesses.'" *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (citations omitted); *Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998) ("One of the most time-honored principles of appellate review is that trial courts are best situated to determine the credibility of the witnesses and to resolve factual disputes hinging on credibility determinations."). In conducting this deferential review, "a trial court's determination of credibility will not be overturned on appeal unless there is clear and convincing evidence to the contrary." *Allstate Ins. Co. v. Tarrant*, 363 S.W.3d 508, 515 (Tenn. 2012). Review as to a trial court's determination on questions of law is "de novo with no presumption of correctness accorded to the rulings of the courts below." *McNabb v. Harrison*, 710 S.W.3d 653, 658 (Tenn. 2025). The Tennessee Supreme Court has indicated that "[a]ppellate courts should reverse custody decisions 'only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence.'" *Kelly*, 445 S.W.3d at 696.

## III.

Mother alleges a due process error in the court's decision regarding the presentation of proof in the evening of the third day of trial. She argues that she was not permitted to present her case until almost 4:00 p.m. that day and that the court erred in not allowing a continuance. She also asserts the presentation of proof was "unbalanced." Father responds that Mother had a reasonable opportunity to be heard and that the trial court correctly found that litigation had spanned nine years and that there was an interest in bringing the case to a close.

We conclude that Mother has failed to show the trial court committed reversible error. In the proceedings before the trial court, the GAL presented the testimony of the two educators. Father presented his own testimony and that of Dr. Spirko and grandmother. Father also called Mother as a witness, and her testimony began on the second day of trial and took up the bulk of the third day. Although she was also recalled by her own attorney, much of the testimony she gave to support her case was presented while she testified either on direct or cross examination as Father's witness. Pamela H. and Dr. Hunsley testified for Mother in the evening hours.

After the close of proof, Mother's counsel requested to conduct closing arguments either by writing or by zoom at a subsequent time. The court initially stated it was willing to do so, so long as the arguments were made in the "next couple of days." The trial court addressed Father's motion to dismiss the guardianship petition, which obviated the need for proof from the Guardians, and it addressed the GAL's fees. The trial court then recessed to give the parties time to discuss whether they would prefer to submit written closing arguments at a later time or simply conduct the closing arguments that evening. When court resumed, the GAL stated that she and Father's attorney preferred to argue that night, while Mother's attorney did not. Mother's attorney did not, however, move for a continuance at this time or otherwise object to argument being presented.

We conclude that Mother's argument has been waived. *See*, *e.g.*, Tenn. R. App. P. 36 ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *State v. Walls*, 537 S.W.3d 892, 899 (Tenn. 2017) (stating that "[o]bjections to improper procedure must be voiced contemporaneously to give the trial judge the opportunity to correct the error on the spot. In the absence of a contemporaneous objection, any error [is] waived" (quoting *State v. Estes*, 655 S.W.2d 179, 186 (Tenn. Crim. App. 1983))); *Sneed v. Bd. of Pro. Resp. of Sup. Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010) (indicating that "[i]t is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her"). Mother never moved for a continuance or otherwise objected to the presentation of proof lasting into the evening and night. The trial court had informed the parties that the hearing would proceed to the completion of proof on the last day, and while Mother cites to places where her counsel mentioned being tired, she cites to no place where she requested to continue the presentation of proof or requested additional time to present evidence. To the contrary, Mother's counsel specifically indicated that she was "ready to go" and would "push through" to get her proof presented. Additionally, Mother has provided no indication of what additional evidence she would have presented or any clear indication of how her presentation of proof was adversely affected. Simply stated, Mother has failed to show that the trial court committed any reversible error.

IV.

Mother challenges various aspects of the parenting plan. For one of those challenges, she asserts that the trial court erred by limiting her parenting time to 18 overnight days, arguing that the decision is inconsistent with a statutory directive to permit each parent the maximum participation possible. *See* Tenn. Code Ann. § 36-6-106(a). Father responds that the trial court correctly determined that Mother had engaged in misconduct which necessitated limiting her parenting time under Tenn. Code Ann. § 36-6-406. Mother replies that the findings Father references were not made in relation to this determination.

"[N]either trial nor appellate judges have any responsibility greater than to attempt to correctly adjudicate child custody disputes." *Burden v. Burden*, 250 S.W.3d 899, 904 (Tenn. Ct. App. 2007) (quoting *Deitmen v. Deitmen*, No. 86-30-II, 1986 WL 6057, at *1 (Tenn. Ct. App. May 29, 1986)). Because a trial court has the opportunity to observe witnesses, it holds broad discretion in custody determinations. *Id.* "[D]etermining the details of parenting plans is 'peculiarly within the broad discretion of the trial judge.'" *Armbrister v. Armbrister*, 414 S.W.3d 685, 693 (Tenn. 2013) (quoting *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988)). Accordingly, "[a] trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion." *Id.* A trial court in general abuses its discretion when it applies "incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *West v. Schofield*, 460 S.W.3d 113, 120 (Tenn. 2015) (citing *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008)).

"The abuse of discretion standard does not require a trial court to render an ideal order, even in matters involving visitation, to withstand reversal. Reversal should not result simply because the appellate court found a 'better' resolution." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001). Accordingly, "[i]t is not the function of appellate courts to tweak a visitation order in the hopes of achieving a more reasonable result than the trial court." *Id.* "An abuse of discretion in child custody cases occurs when the trial court's decision 'falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record.'" *Cooper v. Cooper*, 704 S.W.3d 784, 798 (Tenn. Ct. App. 2024)(quoting *Armbrister*, 414 S.W.3d at 693).

Under Tennessee Code Annotated section 36-6-406,

(d) A parent's involvement or conduct may have an adverse effect on the child's best interest, and the court may preclude or limit any provisions of a parenting plan, if any of the following limiting factors are found to exist after a hearing:

(1) A parent's neglect or substantial nonperformance of parenting responsibilities, including the failure to pay court-ordered child support;

(2) An emotional or physical impairment that interferes with the parent's performance of parenting responsibilities as defined in § 36-6-402;

(3) An impairment resulting from drug, alcohol, or other substance abuse that interferes with the performance of parenting responsibilities;

(4) The absence or substantial impairment of emotional ties between the parent and the child;

(5) The abusive use of conflict by the parent that creates the danger of damage to the child's psychological development;

(6) A parent has withheld from the other parent access to the child for a protracted period without good cause;

(7) A parent's criminal convictions as they relate to such parent's ability to parent or to the welfare of the child; or

(8) Such other factors or conduct as the court expressly finds adverse to the best interests of the child.

Tenn. Code Ann. § 36-6-406(d) (effective June 11, 2020 to May 1, 2025).

Mother asserts that the trial court made inadequate findings under Tenn. Code Ann. § 36-6-406. Under Tennessee Code Annotated section 36-6-101(a)(2)(A)(i), "[u]nless both parents have agreed to a custody arrangement and parenting plan, orders for custody arrangements must include written findings of fact and conclusions of law to support the basis for the order." Additionally, Tennessee Code Annotated section 36-6-106 requires that "in a child custody order, whether temporary or permanent, the court shall include written findings of fact as to whether the limitations in § 36-6-406(a)-(d) apply."

The trial court identified three of Tennessee Code Annotated section 36-6-406(d) factors in limiting Mother's parenting time in accordance therewith. Specifically, the trial court identified

(1) A parent's neglect or substantial nonperformance of parenting responsibilities;

. . .

(4) The absence or substantial impairment of emotional ties between the parent and the child;

(5) The abusive use of conflict by the parent that creates the danger of damage to the child's psychological development. . . .

Mother, in her reply brief, however, argues that Father impermissibly relies on the detailed findings set forth in the best interest analysis to support the trial court's Tennessee Code Annotated section 36-6-406(d) determination. The trial court in this case made extensive and detailed findings. Mother offers no authority for the proposition that the trial court needed to repeat those findings in the same paragraph in which it found three limiting factors under Tennessee Code Annotated section 36-6-406(d).

This court has previously concluded that

[w]hile the best practice would have been for the trial court to more explicitly explain that it was restricting Husband's visitation under a specific provision or provisions of section 36-6-406, we conclude that the trial court's order as a whole, coupled with the transcript of the divorce hearing, is sufficiently detailed so as to establish that the trial court was applying section 36-6-406 in this matter.

*Cooper*, 704 S.W.3d at 800-01. In the present case, in addition to the extensive factual findings the trial court set forth elsewhere in its opinion, the trial court went further by identifying the specific subsections of Tennessee Code Annotated section 36-6-406(d) that were proven. Additionally, the trial court in a paragraph addressing its Tennessee Code Annotated section 36-6-406(d) determination set forth express findings regarding subsections (d)(1) and (d)(5). We simply find no basis for concluding that the trial court's findings were deficient.

Mother also substantively challenges the trial court's ruling, asserting that a restriction such as that in this case can only be imposed under "extreme circumstances," citing *Melvin v. Melvin*, 415 S.W.3d 847, 851 (Tenn. Ct. App. 2011) ("In the absence of extreme circumstances, however, the public policy of this state, as expressed by Tennessee Code Annotated § 36-6-301 and reiterated by considerable case law, is that the non-custodial parent be awarded visitation reasonably sufficient to maintain the parent-child relationship."). Assuming that Mother is correct, she does not explain why the circumstances here are not "extreme." In this case, the trial court found Mother has never demonstrated a desire to parent the child. The trial court was especially concerned that even on the eve of the court-ordered change in custody in incredibly difficult circumstances

of this case for Preston, Mother still had failed to make any attempt to step into the role of a parent. Instead of helping with this extremely difficult transition, Mother had elected to travel. The trial court concluded that, while declining to take necessary actions to step forward in parenting Preston, Mother continued to interfere with Father's attempts to parent, and she has deprived Father of the care and custody of his child. The trial court observed that for nine years Mother insisted upon an adoption despite Father's objections, facilitated multiple termination petitions in three separate states, misrepresented to a Florida court her reasons for moving to Tennessee, resulting in years of further delay in a transition that would have occurred at a much younger age for Preston, told the child's school that Father had no parental rights, and otherwise put significant obstacles in Father's way in his attempt to parent his child. Furthermore, the trial court found persuasive Dr. Spirko's testimony that Mother had engaged in parental alienation and Dr. Spirko's recommendation that contact with Mother should be limited. Accordingly, even if Mother is correct, we fail to see how the decision is an abuse of discretion under the unique circumstances of present case. *See, e.g., Cooper*, 704 S.W.3d at 803 (quoting *Armbrister*, 414 S.W.3d at 693).

V.

Mother also alleges error in the decision to name Father primary residential parent and to award him sole decision-making authority. Father counters that the decision was not an abuse of discretion and that the trial court's extensive findings satisfied the statute.

Trial courts have broad discretion in deciding custody and visitation arrangements, so long as they base their decision on proof and appropriately apply the relevant principles of law. *Grissom v. Grissom*, 586 S.W.3d 387, 391 (Tenn. Ct. App. 2019). When determining which parent should have primary residential custody, the trial court must "conduct a 'comparative fitness' analysis, requiring the court to determine which of the available parents would be comparatively more fit than the other." *Id.* at 392 (quoting *Chaffin v. Ellis*, 211 S.W.3d 264, 286 (Tenn. Ct. App. 2006)). The court must consider the factors enumerated in Tennessee Code Annotated section 36-6-103(a) and take into account "the location of the residences of the parents, the child's need for stability and all other relevant factors." *Kelly*, 445 S.W.3d at 696 (quoting Tenn. Code Ann. § 36-6-106(a)). "[T]he ultimate question as to who should be the primary residential parent on appeal is whether the trial court abused its discretion in its selection." *Maupin v. Maupin*, 420 S.W.3d 761, 770 (Tenn. Ct. App. 2013).

In the case at bar, the designation of a parenting plan is particularly difficult because Preston has lived his whole life with the Guardians. Both the trial court and this court have acknowledged that the change in custody will cause him some amount of trauma and distress.

Nevertheless, in conducting a comparative analysis to review the primary residential

parent designation, it is apparent that Father has, from the time of Preston's birth, done everything possible to prepare to parent his child. Father has numerous times over the years, when Preston was a baby, a preschooler, and a school-aged child, prepared a room and purchased furniture and other effects for Preston. He has travelled to Florida and Tennessee numerous times to visit Preston. He underwent and paid for psychological testing because Mother and the Guardians insisted he must do so to see Preston. Father has owned his home for five years, has held the same job for three years, and has a girlfriend of four years. He has identified essential resources in Michigan to help Preston, such as schools and doctors. He has taken Preston on overnight and week-long visits in the Nashville area, to Michigan, and to see his extended family. He has done this despite barriers being erected by Mother and the Guardians, including Mother's false representation to the school that he had no parental rights. Mother, on the other hand, has demonstrated that her role is that of a willing occasional playmate and family friend to Preston. She has never kept him overnight, although she has had relatively free access to him due to her close relationship with the Guardians. Mother's expenditures demonstrate that she has not spent significant time in Tennessee with Preston, even as the inevitable change in custody drew near; in fact, she spent the bulk of the month of November out of the country rather than staying near Preston to try to acclimate him to her having a larger role in his life. While Mother has also identified essential resources near her for Preston, she has failed to take the important step of transitioning into a parental role in his life.

Mother's appellate argument on this issue essentially asks this court to repudiate the trial court's findings. For instance, she alleges that Father's "lack of involvement" should contrast with Mother's "consistent and loving relationship." Not so, according to the trial court's findings. The court, to the contrary, found that Father was as involved as it was possible for him to be, given the obstructions erected by Mother and the Guardians, whereas Mother voluntarily maintained the role of a family friend rather than parent. The record does not preponderate against the court's factual findings. *See* Tenn. R. App. P. 13(d).

In making the determination regarding the primary residential parent, the court must consider the factors in Tenn. Code Ann. § 36-6-106(a). *Grissom*, 586 S.W.3d at 392. Accordingly, "Tennessee case law reflects that meaningful appellate review is far more feasible when the trial court's order demonstrates that it indeed considered the factors enumerated in section 36-6-106." *Id.* at 393-94. While the statute does not require the court to list every appliable factor along with its conclusion regarding how the factor affected the custody determination, *id.* at 393, the trial court here in fact did so. We have reviewed above the trial court's extensive findings regarding these factors, and we find no merit in the contention that the findings are deficient. Nor do we find any abuse of discretion in the trial court's determination to award primary residential parent status to Father.

Regarding sole decision-making authority, Mother argues that the trial court did not

make specific findings under Tennessee Code annotated section 36-6-407 in awarding Father sole decision-making authority. The statute provides that the court "shall" award sole decision-making to one parent if it finds that "[a] limitation on the other parent's decision-making authority is mandated by § 36-6-406." Tenn. Code Ann. § 36-6-407(b)(1). If the basis of limitation is not mandatory under section 406, then the trial court must consider certain criteria:

> (c) Except as provided in subsections (a) and (b), the court shall consider the following criteria in allocating decision-making authority:
>
> (1) The existence of a limitation under § 36-6-406;
>
> (2) The history of participation of each parent in decision making in each of the following areas: physical care, emotional stability, intellectual and moral development, health, education, extracurricular activities, and religion; and whether each parent attended a court-ordered parent education seminar;
>
> (3) Whether the parents have demonstrated the ability and desire to cooperate with one another in decision making regarding the child in each of the following areas: physical care, emotional stability, intellectual and moral development, health, education, extracurricular activities, and religion; and
>
> (4) The parents' geographic proximity to one another, to the extent that it affects their ability to make timely mutual decisions.

Tenn. Code Ann. § 36-6-407(c).

As discussed above, the trial court found the existence of three limiting factors under Tennessee Code Annotated section 36-6-406(d). The court also made extensive factual and credibility findings directly relevant to the section 407(c) factors that are fully supportive of the trial court's ultimate conclusion to award sole-decision making authority to Father. While we agree with Mother that the trial court's order was deficient in failing to expressly address Tennessee Code Annotated section 36-6-407 regarding decision-making authority, the trial court's extensive findings enable us to understand the basis of the trial court's decision and to conclude both that there is no error as to the trial court's ultimate conclusion and that its underlying findings plainly support its decision.[9]

VI.

---

[9] *See generally Bailey v. Bailey*, No. M2022-01467-COA-R3-CV, 2025 WL 1517411, at *12-13 (Tenn. Ct. App. May 28, 2025) (noting the options of remanding or soldiering on where there are deficiencies in findings by the trial court and delineating when the different approaches would be appropriate).

In reaching its conclusions as to the parenting plan, the trial court considered Preston's best interest. Mother challenges the trial court's best interest analysis. "In any proceeding between parents under this chapter, the best interests of the child shall be the standard by which the court determines and allocates the parties' parental responsibilities." Tenn. Code Ann. § 36-6-401. Accordingly, while a trial court has broad discretion in fashioning a parenting plan, the "polestar, the *alpha and omega*" is the best interest of the child. *Steen v. Steen*, 61 S.W.3d 324, 327 (Tenn. Ct. App. 2001) (quoting *Bah v. Bah*, 668 S.W.2d 663, 665 (Tenn. Ct. App. 1983)); *see Smallbone v. Smallbone*, No. M2020-01556-COA-R3-CV, 2022 WL 1405655, at *4 (Tenn. Ct. App. May 4, 2022) ("While a trial court has broad discretion in fashioning a parenting plan, the touchstone is the best interest of the child."). The court's discretion is not unbounded, but must be based on proof and appropriate legal principles. *Hogue v. Hogue*, 147 S.W.3d 245, 251 (Tenn. Ct. App. 2004).

In engaging in the best interest analysis, the court must consider the relevant applicable factors set out in Tennessee Code Annotated § 36-6-106(a):

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

- 30 -

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent, or to any other person, including the child's siblings. The court may, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules;

(15) Any other factors deemed relevant by the court; and

(16) Whether a parent has failed to pay court-ordered child support for a period of three (3) years or more.

Tenn. Code Ann. § 36-6-106 (effective April 23, 2024 to May 1, 2025).

The trial court found the bulk of these factors weighed in Father's favor, although it found factors (3), (4), (12), (13), (15), and (16) were inapplicable or neutral. Mother challenges the trial court's findings as to all the factors which the trial court weighed in Father's favor.

Mother asserts that factor (1), regarding the strength and stability of the child's relationships with the parent, should have weighed in Mother's favor or been neutral. She points to the evidence that she has visited the child since birth, participated in school events, and engaged in activities with the child. However, the record does not preponderate against the trial court's factual findings that, despite having largely unlimited access to the child, Mother never developed a parental relationship with Preston, whereas Father, with much more limited access because of barriers erected by Mother and the Guardians, did develop a parental relationship with Preston. The court found Mother's relationship was that of a good family friend. Even though Mother had known for years that Preston might have to transition to her care, she has made no attempt to deepen her relationship or to assume a parental role. Here, with the unusual circumstances of the present case, neither parent has performed the majority of daily parenting responsibilities. In reviewing the evidence presented regarding Preston's relationships with his two biological parents, we cannot say the evidence preponderates against the finding that Father was more of a parent-figure to Preston than Mother was, and that Father had a stronger relationship with Preston.

Mother also asserts that the court erred in its determination regarding factor (2), having to do with each parent's potential for performance of parenting responsibilities and ability to encourage a close and continuing relationship with both parents. The trial court found this factor strongly favored Father, who was able to follow court orders, over Mother, who had attempted to obstruct Father's parenting time. The court did not credit Mother's professions that she would include Father, finding that "her actions have told a different story." *See Demers v. Demers*, 149 S.W.3d 61, 70 (Tenn. Ct. App. 2003) (noting that we will not disturb credibility determinations absent concrete, clear, and convincing evidence). The court specifically found that Mother had refused to let Father visit Preston without supervision, falsely told Preston's school that Father had no parental rights, made allegations of sexual assault nine years after the events but contemporaneously with an expansion of Father's parenting time for purposes of affecting these matters, lied to a Florida court regarding her reasons for relocation in order to try to terminate Father's rights, resulting in years of additional time of Father being unable to parent Preston, and stated she would rely on the Guardians for guidance, despite the fact that the Guardians had impeded and denied zoom calls, attempted to record a session with Dr. Spirko in violation of a specific court order, and failed to follow instructions regarding custody exchange. The court found that this factor strongly favored Father.

Mother's objection is in large part a challenge to the trial court's factual findings: she asserts that she attempted to facilitate Father's relationship by creating a Google Drive and offering Father contact with Preston. However, the court emphasized Mother's acts tending to interfere with Father, as set out above. Mother's brief also confuses visitation with parental rights, asserting that her statement to the school that Father "does not have parental rights to Preston" was not inaccurate because he had no visitation at the time. To the contrary, however, Mother was aware at the time that the termination of Father's parental rights had been denied (three times) and that, ergo, he retained those parental rights. Her statement to the school was false, and the trial court did not err in concluding that it was an attempt to obstruct Father's access to Preston. The record does not preponderate against the court's finding that Mother thwarted Father's visitation, while Father alternatively facilitated contact with Mother by placing calls during his visitation time.

Mother also asserts that the actions of the Guardians should not be attributed to her. This argument misses the mark, as the trial court's order clearly relied on Mother's own statement that she would be guided by the Guardians. The court found that the Guardians had engaged in misconduct and obstruction of Father's rights, that Mother intended to rely on them to guide her, and that "if that is the case, there could be a lot of problems."

Mother likewise questions the trial court's reference to the sexual assault allegations. Mother's brief focuses on a public policy argument that reporting of sexual assault should be encouraged, which is a correct point. We note though that the trial court did not actually find the reporting itself problematic; rather, it found that the timing of the reporting was "an attempt to keep Father away from the child." The trial court found Mother's contention that she had some other purpose was entirely lacking in credibility. Mother offered no explanation for the timing of the report, nine years after the alleged assault but immediately after a court-ordered expansion of Father's parenting time. The record does not preponderate against the inference drawn by the trial court that the timing of the report was another attempt to interfere with Father's parenting, after years of attempts to create barriers to Father's access to Preston. Mother also argues that the conduct should not be held against her because the child was not aware of the conduct. This argument, however, misses the point of the trial court's order. The trial court did not in this case view the reporting as problematic because the child was exposed to her contention, but instead it was problematic, according to the trial court, because Mother reported for the purpose of interfering with Father's access to the child. Even putting aside the reporting, the record is replete with a variety of actions by Mother that support the trial court's ultimate conclusion as to this factor. Simply stated, with or without the consideration of the reporting, Mother's actions support the trial court's wariness of Mother's ability to facilitate and encourage a close bond between Preston and Father.

Mother asserts that factor (5), regarding the degree to which each parent has been the primary caregiver, should weigh in her favor. The trial court found that Father had

"time and time again, since the child was born (or when he found out the child was born), done everything in his power to have a relationship with his son and show his desire to parent his son," despite expense and obstacles.  On the other hand, Mother's expenditures demonstrated that she had spent very little time with the child since 2021, despite her representation to the Florida court that she was relocating to Tennessee in order to assume parental responsibilities.  The court noted that Mother was aware that the court would decide the parenting plan at the December hearing but nevertheless had still not had a single overnight visitation and had spent almost all of November in Africa rather than visiting Preston.  The court found this factor "pivotal" because "one parent has never demonstrated the desire to parent."

Mother takes exception to this, citing her many statements that she would want custody if the Guardians did not have it.  She asserts that the trial court erred in not considering that her desire for adoption was in Preston's best interest.  But the trial court did not hold Mother's desire to facilitate the adoption against her; instead, it found that her professions of a desire for custody were contradicted by her actions, notably her actions after it became clear that adoption was no longer a viable option.  *Cf. In re Jaxx M.*, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at *9 (Tenn. Ct. App. Apr. 17, 2019) (a court looks to more than mere words in evaluating a parent's willingness to assume custody).

The court also noted that even after it was clear that the adoption could not take place, Mother still made no effort to establish a parental relationship with Preston, did not seek to have him visit her overnight, and in fact left the country for the month immediately prior to the hearing.  The record does not preponderate against this finding.

Mother also asserts that Father did not take advantage of visitation offered to him; however, the trial court's findings and the proof demonstrate that Father went to extreme efforts to have contact with Preston, including paying thousands of dollars for a mental evaluation Mother insisted on and weathering the Guardians summoning the police when he arrived early for visitation.  Although in this case neither parent has been the primary caregiver, Father, who has had custody of Preston for week-long periods, has come closer than Mother, who has never even had an overnight visit.

Mother also asserts that factor (6), regarding love, affection, and emotional ties, should have weighed in her favor.  The trial court found that Mother and Father both introduced proof that Preston enjoyed spending time with them, but the court relied on Father's and Dr. Spirko's testimony that Preston did not bring up Mother and had a stronger tie with Father.  The court placed, "some" weight on this factor.  Mother's brief urges us to conclude that the court erred in crediting Dr. Spirko over Dr. Hunsley.  However, this court does not disturb a credibility determination absent concrete, clear, and convincing evidence to the contrary, *Demers*, 149 S.W.3d at 70, and Mother has presented no such evidence.

Regarding factor (7), the emotional needs and developmental level of the child, the court noted that Father, Dr. Spirko, and the school employees all testified that the child did not exhibit behavioral or intellectual issues. The Guardians, on the other hand, in possession of two provider opinions that the child did not have autism, sought out a third opinion stating that he did. They sought out multiple therapies, including the neurofeedback which caused Preston to think that "his brain is wrong." Dr. Spirko, who had experience with autism, did not believe the child had autism and recommended that he be removed as soon as possible from the Guardians. The trial court found Mother aligned herself with the Guardians and would likely continue their treatments. The court weighed this factor heavily in Father's favor.

Mother contends on appeal that the court improperly rejected the third provider's autism diagnosis. However, the court did not determine that the autism diagnosis was incorrect. The court was faced with testimony that the diagnosis was made after the Guardians sought a third opinion, and that Dr. Spirko, who was experienced with autism, did not believe the child had autism, while the child's teachers described him as normal and not in need of the accommodations on his 504 plan. The trial court's weighing of this factor appeared to hinge on the testimony that the child did not display any problematic behaviors when with Father or at school and on its crediting Dr. Spirko's opinion that the child was suffering from a high-stress and high-anxiety household. The court weighed this factor against Mother only after noting that she aligned herself with the therapies provided by the Guardians. Mother's testimony that she and the Guardians "work as a team" supports the court's determination that she would continue the therapies which Dr. Spirko opined were contributing to the child's distress.

Regarding the moral, physical, mental, and emotional fitness of the parents as outlined in factor (8), the court found that Mother's reporting of the sexual assault immediately after the court awarded Father expanded parenting time to influence the proceeding was an attempt at alienation. It further noted that Mother was dishonest with the school when she told it Father had no parental rights and that she practiced deceit on the Florida court when she represented she wanted to move in order to parent Preston. The court also noted that Mother had held three jobs in three years and that her living arrangement at her sister's condo was "loose." Father, on the other hand, owns his home, has had stable employment at the same job, and is in a long-term relationship. The court found Father's lifestyle was "emotionally the healthiest and the most stable."

Mother objects by arguing that the court found the report of sexual assault was alienation without finding it was false, and she asserts that the court failed to explain how the report impacted the child. But the court clarified elsewhere in the order that it found not the report itself but the timing of the report (nine years after the event and immediately after the court's September award of parenting time) was an attempt to sabotage Father's parenting time. Mother does not contend that an effort to limit Father's parenting time

would have no effect on the child. In regard to her fitness, Mother notes that she was employed and had the ability to provide for the child. While the court found elsewhere that both parties could provide suitable physical support for the child, it also found Mother had engaged in a pattern of "misrepresentation, or outright deceit." The court made an explicit credibility determination against Mother. This credibility determination is amply supported by Mother's acts, including her representation to the Florida court that she was relocating to parent Preston when she instead immediately supported another termination petition and her statement to the school that Father had no parental rights, although she was aware the termination had been denied. In any event, the evidence does not preponderate against the trial court's finding that Mother's multiple deceptive acts, many of which were aimed at denying Father contact with the child, reflected on her moral, mental, or emotional fitness.

Mother also objects, under factor (9) regarding the child's relationships with other relatives and physical surroundings, to the "court's suggestion that the child's meaningful relationships are confined to the [Guardians'] household." The court found that this factor had relatively little weight because Preston's most significant relationships were with the Guardians in Tennessee and because the court was tasked with allocating time between Mother in Florida and Father in Michigan. While Mother is correct that she introduced proof that Preston went on annual week-long trips which included both her family and the Guardians' family, the evidence does not preponderate against the trial court's finding that Preston's family relationships outside the Guardians' household are secondary and that this factor favors neither biological parent.

The trial court found under factor (10), the importance of continuity in the child's life, that placement with Mother would initially be more familiar for the child and would likely allow the child more contact with the Guardians. However, the court found that the current environment around the child was "high-stress and high-anxiety," referring to its previous findings that Dr. Spirko recommended removal from the Guardians' home as soon as possible, and that Father was best suited to provide stability. Mother describes the finding that stress and conflict would remain in Mother's care as "speculative," but the record shows that Dr. Spirko opined that Preston was suffering due to the therapies and stress associated with the Guardians' home and that Mother had aligned herself with their practices. Moreover, Mother herself contributed significantly to the conflict between the parties, for instance by telling the school that Father had no parental rights, by correcting Preston when he referred to Kelly H. as "Kelly," and by otherwise impeding Father's parenting time. The record does not preponderate against the trial court's findings.

As relevant to factor (11) regarding evidence of physical or emotional abuse, Mother also objects that the trial court found "severe emotional abuse due to the stress and anxiety of this case and the parental alienation caused by Mother" and the Guardians. Mother argues that the actions of the Guardians were being unfairly imputed to her and that the stress of the litigation does not constitute abuse. While Mother is correct that there is

nothing supporting the conclusion that the Guardians' stress about the litigation itself constitutes emotional abuse, the proof at trial included Dr. Spirko's testimony that Mother was engaging in "blatant parental alienation." Accordingly, the trial court was free to credit this testimony, and it did not, as Mother contends, ascribe the Guardians' actions to Mother in concluding she engaged in parental alienation.

Mother also contends the trial court erred in finding Father's daily schedule was "currently more amenable to full-time parenting," as relevant to factor (14), regarding the parents' employment schedules. Mother argues that she testified that her schedule was flexible enough to allow her to care for Preston when needed. However, Mother also testified that her hours varied "wildly," and that she sometimes was required to work early in the morning or late at night. She testified that she had been granted an assistant, who could in the future take over these on-site obligations. Father's current schedule was regular, he worked from home some of the week, and he testified he would be available to drop Preston off and pick him up at school. In accordance with the trial court's finding that Father had taken steps to prepare to assume custody, the trial court found that Father's schedule was already able to accommodate care of a child. While it appears both parents would be capable of managing Preston's care with their work schedules, the court did not err in concluding that Father's schedule was "currently" amenable to the care of a child, whereas Mother's availability would depend on adjustments that had not yet occurred, such as the hiring and training of an assistant.

Overall, we simply cannot conclude that the trial court erred in its determination as to Preston's best interest.

## VII.

Mother also alleges error in the denial of the motion to alter or amend, asserting that evidence of income relevant to child support was improperly excluded. She argues that the child support was based on erroneous income and that reconsideration was necessary to prevent injustice. Father replies that there was no basis for relief under Rule 59.04.

A motion to alter or amend is intended to provide the trial court with an opportunity to correct errors before the judgment becomes final. *In re M.L.D.*, 182 S.W.3d 890, 895 (Tenn. Ct. App. 2005). The litigant is entitled to relief "when the controlling law changes before the judgment becomes final; when previously unavailable evidence becomes available; or to correct a clear error of law or to prevent injustice." *Id.* The motion may not be used, however, "to raise or present new, previously untried or unasserted theories or legal arguments" or to simply relitigate an issue previously adjudicated by the court. *In re March 9, 2012 Order*, 637 S.W.3d 708, 712 (Tenn. Ct. App. 2020) (quoting *U.S. Bank, N.A. v. Tennessee Farmers Mut. Ins. Co.*, 410 S.W.3d 820, 827 n.2 (Tenn. Ct. App. 2012)). "A trial court's determination of whether to grant a Rule 59.04 motion to alter or amend a judgment is reviewed under an abuse of discretion standard." *Linkous v. Lane*, 276 S.W.3d

917, 924 (Tenn. Ct. App. 2008).

Mother asserts that the child support order constitutes a clear error of law and works an injustice. Initially, there is no error of law; the trial court, with notice to all the parties, relied on the testimony before it in determining the income of the parties. Mother cites no authority that reliance on testimony of income is a legal error. *See*, *e.g.*, *State ex rel. Farris v. Bryant*, No. E2008-02597-COA-R3-CV, 2011 WL 676162, at *11 (Tenn. Ct. App. Feb. 24, 2011) (court should have used income as reflected in father's testimony when the court did not discredit father as a witness); *In re Chase R.*, No. W2015-00493-COA-R3-JV, 2015 WL 5813600, at *5 (Tenn. Ct. App. Oct. 6, 2015) (affirming a finding based on testimony that the party's gross monthly income was less than that reflected in the check stubs).

Father testified on the first day of trial, and although Mother was in possession of his income tax returns, neither she nor the Guardians introduced them; nor did Mother seek to challenge his stated income through cross-examination. Mother began her testimony on the second day of trial. Her testimony continued through the bulk of the third day, and she was recalled as the last witness. She testified about her income both when called as Father's witness and when recalled by her own counsel. The court specifically questioned Mother's counsel regarding whether it should rely on the testimony of the parties regarding their income and observed that it did not have Mother's tax returns, at which point Mother's counsel stated she could "enter it together." The tax returns, however, were never entered.

We conclude that under the circumstances here, the court did not err in denying a motion to alter or amend. The trial court correctly found that the motion here was merely seeking to relitigate an issue already adjudicated by the court. *See Rehrer v. Rehrer*, No. E2010-01907-COA-R3-CV, 2011 WL 13165343, at *6 (Tenn. Ct. App. Sept. 15, 2011) ("The husband's attempt to present new evidence was an effort to relitigate a matter that has already been adjudicated, and the Trial Court properly denied the Motion."). The tax returns were not provided to the trial court despite the trial court's notice to the parties that they were omitted. Mother's motion to alter or amend was clearly simply an attempt to relitigate this issue, and the court did not err in denying the motion.

VI.

Father requests his attorney's fees under Tennessee Code Annotated section 36-5-103(c). The statute provides:

(c) A prevailing party may recover reasonable attorney's fees, which may be fixed and allowed in the court's discretion, from the nonprevailing party in any criminal or civil contempt action or other proceeding to enforce, alter, change, or modify any decree of alimony, child support, or provision of a permanent parenting plan order, or in any suit or action concerning the adjudication of the custody or change of custody of any children, both upon

the original divorce hearing and at any subsequent hearing.

Tenn. Code Ann. § 36-5-103(c).

An appeal is a "subsequent hearing" under statute. *Colley v. Colley*, 715 S.W.3d 293, 315 (Tenn. 2025). When a party requests a discretionary award of fees, "the Court of Appeals should analyze any such request by exercising its discretion to determine whether an award to the prevailing party is appropriate." *Eberbach v. Eberbach*, 535 S.W.3d 467, 477 (Tenn. 2017). In making a determination of whether to award attorney's fees to a prevailing party, this court has considered the parties' economic circumstances, whether the appeal was in good faith, and any other equitable factor relevant in the particular case. *See*, *e.g.*, *Blount v. Blount*, 720 S.W.3d 295, 357 (Tenn. Ct. App. 2024); *Chase v. Chase*, 670 S.W.3d 280, 304-05 (Tenn. Ct. App. 2022); *Baxter v. Rowan*, 620 S.W.3d 889, 897-98 (Tenn. Ct. App. 2020); *Ellis v. Ellis*, 621 S.W.3d 700, 709 (Tenn. Ct. App. 2019). "Concerning *appellate* attorney's fees, it is within the sole discretion of this Court whether to award said fees." *Ford v. Ford*, No. M2023-01762-COA-R3-CV, 2026 WL 125827, at *11 (Tenn. Ct. App. Jan. 16, 2026).

Here, Father is the prevailing party. We conclude that the equities of this unusual case favor an award of attorney's fees in connection with this appeal to Father. Accordingly, we remand for a determination by the trial court of the appropriate amount.

## VII.

For the aforementioned reasons, we affirm the judgment of the Juvenile Court for Williamson County and remand for a determination of attorney's fees in connection with this appeal. Costs of this appeal are taxed to the appellant, Sarah Chapman, for which execution may issue if necessary.

s/ Jeffrey Usman
JEFFREY USMAN, JUDGE